**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| ROBERT L. WILLIAMS, ) | |
|              ) | |
|              Plaintiff, ) | |
|              ) | |
| vs.          ) | 1:04-cv-1247-SEB-VSS |
|              ) | |
| DR. KULU, M.D., et al., ) | |
|              ) | |
|              Defendants. ) | |

**Entry Discussing Motion for Summary Judgment**
**and Directing Entry of Final Judgment**

For the reasons explained in this Entry, the defendants' motion for summary judgment must be **granted.**

**I.  Background**

The plaintiff in this civil rights action is Robert L. Williams ("Williams"), who at all relevant times was confined at the Plainfield Correctional Facility ("PCF"). He filed this action on July 28, 2004. Several defendants have been dismissed from the action through previous rulings. The remaining defendants are Lisa Hosea, M.D. ("Dr. Hosea"), Mark A. Ruiz, M.D. ("Dr. Ruiz"), Health Care Administrator at PCF Jeff Rogers ("Rogers"), and Nurse Jerrie Coleman ("Nurse Coleman"). Williams alleges that the defendants were deliberately indifferent to his serious medical needs. He seeks compensatory and punitive damages and injunctive relief.[1]  Dr. Hosea, Dr. Ruiz, and Rogers seek resolution of Williams' claims through the entry of summary judgment. The parties were notified through the Entry of August 2, 2006, that the motion for summary judgment was extended to include the claim against Nurse Coleman.

---

[1] The plaintiff is no longer confined at the PCF, and has been transferred to Branchville Correctional Facility. Therefore, any claim for injunctive relief is **dismissed** as moot. *Higgason v. Farley,* 83 F.3d 807, 811 (7th Cir. 1996). A court lacks jurisdiction to adjudicate a claim that is moot. *Board of Educ. of Downers Grove Grade School Dist. No. 58 v. Steven L.,* 89 F.3d 464, 467 (7th Cir. 1996), *cert. denied,* 520 U.S. 1198 (1997).

"Summary judgment is appropriate where the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Westra v. Credit Control of Pinellas,* 409 F.3d 825, 827 (7th Cir. 2005) (quoting Rule 56(c) of the *Federal Rules of Civil Procedure*). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine only if a reasonable jury could find for the non-moving party. *Id.* "'It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.'" *Sanders v. Village of Dixmoor,* 178 F.3d 869, 870 (7th Cir. 1999) (quoting *Liberles v. County of Cook,* 709 F.2d 1122, 1126 (7th Cir. 1983)).

## II.  Undisputed Facts

On the basis of the pleadings and the expanded record, and specifically on the portions of that record which comply with the requirements of Rule 56(e), the following facts are undisputed for purposes of the motion for summary judgment:

At the PCF, an offender has a number of ways of informing the medical staff of his medical complaints. The most common practice is for an inmate to fill out a Health Care Referral Form ("HCRF").

In 2003, there were two types of sick call. Nursing sick call was used to triage an offender's HCRF's and for follow-up visits. If offenders needed further treatment from a physician, they were either seen by a physician, if available, or scheduled for physician sick call. Physician sick call was used to schedule offender evaluations by a physician. The nursing staff set the schedule for both nursing and physician sick call based upon their understanding of the status of each offender's medical need.

On December 10, 2003, at approximately 2:00 a.m., Williams submitted HCRF #45891. Williams complained of cold-like symptoms, and he was referred to nursing sick call. At approximately 10:30 a.m., Williams was seen in nursing sick call by Nurse Coleman. The Progress Notes indicate that Williams presented with complaints of feeling tired, weak, and dizzy, and that he had a runny nose, scratchy throat, and felt congested. Williams also reported that he had blood in his stool. Williams also stated that he was losing weight because he was not getting enough nourishment. The Progress Notes indicate that Nurse Coleman performed an assessment and noted that Williams' temperature was 98.8, blood pressure 114/92 and oxygen saturation 97%. Williams had normal bowel sounds and his lungs were clear. It was also noted that Williams had hemorrhoids. Williams requested to see a physician, and Nurse Coleman made a referral for physician sick call on his behalf. She advised Williams to take Tylenol or Sudafed from the commissary in the meantime. She also suggested he gargle with salt or plain water.

Later, at 12:20 p.m that same day, a custody officer discovered Williams lying supine on the floor. Nurse Coleman was summoned and she examined Williams. Williams was

non-responsive to verbal stimuli, however, Nurse Coleman indicated that there were no signs of convulsions, tremors, or incontinence. She did note some saliva running out of the corner of Williams' mouth. No other signs of involuntary movement were present. Nurse Coleman initiated an emergency run.

Williams was placed on a stretcher and returned to the medical unit at 12:45 p.m. Upon his arrival at the infirmary, Williams was transferred to a gurney. Nurse Coleman noted that he was resting peacefully at that time and that his blood pressure was 124/80 and his blood sugar was 184. Williams was then referred to a physician.

Williams was examined and evaluated by Dr. Hosea. Dr. Hosea was informed that Williams had lost consciousness after falling backwards and hitting his head on the concrete floor. Williams denied tongue biting or incontinence during this episode. Dr. Hosea noted that Williams had a history of hypertension and anemia secondary to hemorrhoids and that he had been seen in the infirmary earlier that day.  Dr. Hosea further documented that Williams had no history of seizure disorder.

Dr. Hosea conducted a physical examination. Williams was alert and oriented and responded to questions appropriately. Williams stated that he was feeling better at that time. Dr. Hosea diagnosed Williams with a possible syncopal episode due to abnormal blood levels. She also noted that Williams showed some signs of malingering. There is no indication in the medical records that Williams made complaints to Dr. Hosea of neck or back pain at this time.

Dr. Hosea ordered a follow-up Accu-check to check Williams' blood sugar levels and a CBC to check for anemia or other possible blood issues. She also instructed Williams to follow up in physician sick call.

On December 11, 2003, Williams submitted a HCRF requesting to see a physician regarding headaches, dizziness, blurred vision, and shortness of breath. He also requested an x-ray of his skull and neck.  A follow-up physician sick call was scheduled.

On January 12, 2004, Williams refused part of the anemia work up initiated by one of the PCF physicians. Williams submitted a HCRF on January 12, 2004, complaining of dizziness, blurred vision and headache. He was referred to nursing sick call for evaluation. On January 14, 2004, Williams was scheduled to be seen by Dr. Hosea. Dr. Hosea documented in the Progress Notes that Williams did not show up for his scheduled appointment. She refilled his medications and noted that Williams would be seen in nursing sick call.

On January 15, 2004, Williams submitted a HCRF and indicated that he had headaches and blurred vision and requested to see a physician. He was seen in nursing sick call the next day. It was noted that Williams complained of headaches since his fall on December 10, 2003. It was also noted that Williams had experienced headaches since 2000 which were unrelated to any injury. Williams was scheduled for physician sick call with

Dr. Ruiz. On January 29, 2004, after three phone calls, Williams was a "no show" for physician sick call.

On February 4, 2004, Williams submitted a HCRF requesting to see a physician regarding a "black area" on the top of his head and chest area. He was seen in nursing sick call for these complaints on February 5, 2004, and was informed that he already had a physician sick call visit scheduled. Nursing staff noted that there were small scaley areas which Williams reported had been present for several years and which were occasionally itchy.

On February 9, 2004, Williams was seen in nursing sick call for complaints of headaches, vertigo and blurred vision. At the time he was seen, Williams was not experiencing any of these symptoms, although he stated that he had experienced them that morning. He was referred to physician sick call.

On February 10, 2004, Williams was seen by Dr. Ruiz. Dr. Ruiz noted that a colonoscopy had shown that Williams had internal hemorrhoids. He further indicated that Williams' anemia secondary to the hemorrhoids was not improving on Ferrous Sulfate. It was noted that this was the possible cause of any weakness and dizziness. Dr. Ruiz prescribed Metamucil and noted that he would refer Williams to general surgery for a consultation.

That same day, Dr. Ruiz completed a Utilization Management Referral Review form for treatment of Williams' hemorrhoids. A Utilization Management Referral Review Form ("UMRRF") is used for non-emergent off-site medical referrals. On this form, Dr. Ruiz indicated that Williams should be referred to Wishard Memorial Hospital ("Wishard"). He attached Williams' colonoscopy report from February 2003. The Regional Medical Director of Prison Health Services of Indiana, LLC. ("PHS") reviewed this request and approved Williams' general surgery consultation at Wishard.

On February 27, 2004, Williams was seen in nursing and physician sick call. Williams stated that he had daily headaches but he did not have a headache at the time he was seen. The physician noted that follow up for treatment of hemorrhoids was pending.

On April 19, 2004, Williams was seen at Wishard for surgical evaluation. A physician noted that Williams would be scheduled for an elective hemorrhoidectomy as an outpatient. On April 20, 2004, Dr. Hosea submitted a UMRRF requesting that Williams be referred for surgical consultation at Wishard for treatment of his hemorrhoids. She attached the April 19, 2004, clinical note from Wishard. This referral request was authorized by the Regional Medical Director on April 22, 2004.

On April 26, 2004, Dr. Ruiz submitted a UMRRF which indicated that Williams needed to be referred to Wishard for an outpatient hemorrhoidectomy. Dr. Ruiz attached the April 19, 2004 clinical note, colonoscopy report from February 2003, and Progress

Notes from February 10, 2004. The Regional Medical Director approved this request on April 26, 2004. Williams was also seen in nursing sick call for complaints of dizziness and headaches. He requested that his Tylenol be renewed. Mineral oil and Tylenol were ordered.

On June 8, 2004, Williams submitted a HCRF complaining of headaches, neck and back pain. On June 11, 2004, at nursing sick call, Williams was instructed to use heat compresses for back pain and Tylenol or Ibuprofen for headaches.

Dr. Hosea submitted another UMRRF on June 23, 2004. She requested a pre-operative consultation for Williams at Wishard on July 9, 2004, for his pending hemorrhoid surgery at Wishard. The Regional Medical Director approved this request for pre-operative consultation. On July 9, 2004, Williams underwent a pre-operative consultation at Wishard. The clinical notes from this visit indicate that Williams' hemorrhoid surgery which was scheduled for July 19, 2004, would be postponed. Surgical staff at Wishard determined that Williams needed cardiac clearance prior to the scheduled hemorrhoidectomy.

On July 12, 2004, Dr. Ruiz submitted a UMRRF requesting a referral to Wishard Memorial Hospital Cardiology for cardiac clearance for the possible hemorrhoid surgery. He attached a copy of the July 9, 2004 clinical notes from Wishard and indicated that Wishard requested cardiac clearance prior to Williams' surgery. On July 14, 2004, the Regional Medical Director reviewed this request and requested a copy of Williams' CBC. Dr. Ruiz provided this information and also attached an MRI on July 20, 2004.

On July 20, 2004, Williams was seen in nursing sick call in response to complaints of head, neck and back pain. He was instructed to use pain medication from the commissary and to rest on his side with a pillow between his knees.

On July 21, 2004, the Regional Medical Director reviewed Williams' CBC and MRI. He concluded that there was no indication for surgical intervention at that time and denied the request for outside consultation. Dr. Ruiz noted that he would follow Williams.

Williams was seen in physician sick call on August 12, 2004, and examined by Dr. Ruiz. Dr. Ruiz indicated that Williams continued to complain of bright red blood per rectum. It was also noted that Williams had been referred to cardiology for clearance for surgery but was denied secondary to a stable hemoglobin/hematocrit. Dr. Ruiz further noted that Williams had actively bleeding hemorrhoids and that he would make a new referral for cardiac clearance so William's surgery could be rescheduled.

That same day, Dr. Ruiz submitted a UMRRF. Dr. Ruiz indicated that Williams had chronic bright red blood per rectum, and requested that Williams be referred to Wishard Memorial Hospital Cardiology so he could get cardiac clearance for a hemorrhoidectomy. This request was reviewed by the Regional Medical Director on August 13, 2004 who requested more information regarding Williams' medical condition. Dr. Ruiz provided the

requested information on August 16, 2004. That same day, the Regional Medical Director authorized an outpatient cardiac consultation referral. On January 26, 2005, after cardiac clearance, Williams underwent a hemorrhoidectomy at Wishard.

Rogers was the Health Care Administrator at the PCF. Rogers did not possess a license to practice medicine. He never had the authority, ability or responsibility to prescribe medical treatment. He did not have the authority to override any physician orders for medical treatment. His sole responsibilities were to deal with staffing and supply issues and to assist the medical staff in an administrative capacity. Rogers was not responsible for the scheduling of off-site surgical consultations or other medical referrals. All outside medical referrals were scheduled by an employee of the Indiana Department of Correction and a member of the outside medical facility.

### III. Discussion

To be liable for damages, an individual must have personally participated in the alleged constitutional deprivation. *Zimmerman v. Tribble,* 226 F.3d 568, 574 (7th Cir. 2000); *see also Sanville v. McCaughtry,* 266 F.3d 724, 740 (7th Cir. 2001) (to be liable for the deprivation of a constitutional right, an individual must personally participate in the deprivation or must direct the conduct or have knowledge of and consent to the conduct). The record is undisputed that defendant Rogers held an administrative position at PCF and that he had no authority or responsibility for making any medical decisions. Williams has not presented any evidence which creates a genuine issue of fact that Rogers was deliberately indifferent to Williams' serious medical needs. In fact, Williams has shown no causal link between Rogers and the medical care Williams received or failed to receive at PCF. Rogers is therefore entitled to summary judgment.

The Eighth Amendment's proscription against the imposition of cruel and unusual punishment provides the constitutional standard for the treatment of convicted offenders such as Williams. *Helling v. McKinney*, 509 U.S. 25, 31-32 (1993). The Eighth Amendment's proscription against cruel and unusual punishment protects prisoners from the "unnecessary and wanton infliction of pain" by the state. *Hudson v. McMillian,* 503 U.S. 1, 5 (1992) (citation and internal quotations omitted). Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement by ensuring that inmates receive adequate food, clothing, shelter, and medical care, and by taking reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994).

> A claim of deliberate indifference to a serious medical need contains both an objective and a subjective component. To satisfy the objective component, a prisoner must demonstrate that his medical condition is "objectively, sufficiently serious." A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention. To satisfy the subjective component, a prisoner must demonstrate that prison

6

>officials acted with a "sufficiently culpable state of mind." The officials must know of and disregard an excessive risk to inmate health; indeed they must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "must also draw the inference." This is not to say that a prisoner must establish that officials intended or desired the harm that transpired. Instead, it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk. Additionally, a fact-finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

*Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005) (some quotations and internal citations omitted).

A court examines the totality of an inmate's medical care when determining whether defendants have been deliberately indifferent to an inmate's serious medical needs. *Reed v. McBride,* 178 F.3d 849, 855 (7th Cir. 1999). It is well-settled that while incarcerated, an inmate is not entitled to the best possible care or to receive particular treatment of his choice. *See Forbes v. Edgar,* 112 F.3d 262, 267 (7th Cir. 1997). Negligence, even gross negligence, is insufficient to establish deliberate indifference under the Eighth Amendment. *See Farmer,* 511 U.S. at 835; *Mathis v. Fairman,* 120 F.3d 88, 92 (7th Cir. 1997); *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). Williams is "entitled to reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267.

Williams first argues that Nurse Coleman failed to properly treat him on December 10, 2003, which caused him to pass out and hit his head on the floor. The record reflects that Nurse Coleman noted his complaints of cold symptoms, dizziness, hemorrhoids, and blood loss. She recorded his vital signs. She advised Williams to take Tylenol or Sudafed and she also made a referral for physician sick call.[2] There is no evidence that anything Nurse Coleman did or failed to do caused Williams to fall hours later. Assuming for the sake of this motion that Williams was experiencing a "serious medical need," there is no evidence that Nurse Coleman disregarded a substantial risk of harm.

Williams next argues that Dr. Ruiz and Dr. Hosea failed to evaluate with x-rays and MRI's his head, neck and back injuries after his fall on December 10, 2003. He also contends that he should have been allowed to be seen by a specialist. The evidentiary record shows that Williams was seen on a number of occasions by nurses and physicians for his complaints of pain. At best, Williams disagreed with the type or amount of care that he was given, but this does not support a claim of deliberate indifference. The defendants examined Williams and ordered Tylenol and Ibuprofen for pain. There is no indication that x-rays were warranted under the circumstances. Nor was Williams entitled to be seen by

---

2Williams' allegations as to Nurse Coleman's conduct unrelated to this case in 2004 are irrelevant and completely lacking in evidentiary support.

any particular specialist.  At most, Williams' view represents a mere difference of opinion, and "[a] difference of opinion as to how a condition should be treated does not give rise to a constitutional violation." *Garvin v. Armstrong,* 236 F.3d 896, 898 (7th Cir. 2001).

The record shows a concern on the part of Dr. Hosea and Dr. Ruiz for Williams' complaints of weakness and dizziness. After examining Williams on December 10, 2003, it was Dr. Hosea's opinion that Williams had possibly experienced a syncopal episode due to abnormal blood levels.  She ordered blood tests to check for anemia or other blood issues. She also instructed Williams to follow up in physician sick call.  When Dr. Ruiz saw Williams in February of 2004, he determined that the medications were not improving Williams' anemia secondary to hemorrhoids, and he referred Williams for a surgery consultation at an outside hospital.  Dr. Hosea and Dr. Ruiz each sought and obtained the required approval for various stages of treatment of Williams' hemorrhoids at the hospital.

Williams contends that Dr. Ruiz and Dr. Hosea were responsible for the initial cancellation of his surgery. The record does not support this theory.  Rather, the record is undisputed that neither Dr. Ruiz nor Dr. Hosea was involved in the decision to postpone the scheduled surgery.  When the cardiac clearance was not approved, Dr. Ruiz noted that Williams continued to have actively bleeding hemorrhoids and he made another referral for cardiac clearance so that surgery could be rescheduled. Ultimately, the cardiac clearance required by Wishard was approved and the surgery was performed.

An examination of the totality of care given to Williams shows that Williams did not suffer medical mistreatment or a denial of medical care while he was confined at the PCF, even if he suffered pain from his physical conditions. The evidentiary record negates the presence of the subjective state of mind required to show deliberate indifference, *i.e.,* that the defendants were "subjectively aware of [Williams'] serious medical needs and disregarded an excessive risk that a lack of treatment posed to his health or safety from lack of treatment." *Wynn v. Southward,* 251 F.3d 588, 593 (7th Cir. 2001).

### IV.  Conclusion

Williams has not identified triable issues of fact in support of the claims asserted in his amended complaint. Judgment as a matter of law is appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). That is the case here. Accordingly, the defendants' motion for summary judgment must be **granted**. Judgment consistent with this Entry and with the Entries of July 14, 2005, and July 26, 2005, shall now issue.

**IT IS SO ORDERED.**

Date: 10/26/2006

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana